# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GEORGE LOUIS BOZIK,

Defendant-Appellant.

UNPUBLISHED
November 24, 2015

No. 322869
Muskegon Circuit Court
LC No. 14-064685-FH

Before: MARKEY, P.J., and OWENS and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant appeals as of right his convictions for second-degree criminal sexual conduct (regarding a person under 13 years of age), MCL 750.520c(1)(a); and assault with intent to commit second-degree criminal sexual conduct, MCL 750.520g(2). The trial court sentenced defendant to 15 to 30 years' imprisonment for second-degree criminal sexual conduct, and 3 to 10 years' imprisonment for assault with intent to commit second-degree criminal sexual conduct; with the sentences to be served concurrently. The trial court amended its original judgment of sentence to reflect that defendant was sentenced as a third-offense habitual offender under MCL 769.11. For the reasons set forth below, we affirm defendant's convictions.

## I. FACTS

On July 8, 2012, defendant moved into a home with a woman named Sandra and Sandra's nine year old daughter, CB. Sandra and defendant were in a dating relationship, and had met two weeks before defendant moved in with her. When defendant moved in, he suggested to CB that she call him "dad" since her biological father was not involved in her life, and CB did so.

According to CB, during the summer of 2012, defendant perpetrated two sexual assaults against her. The first assault occurred at night after CB went to bed. Defendant climbed in bed with her and unzipped his pants while he touched her on her chest, vagina, and bottom. CB was too scared to tell her mother what happened after the first assault.

The second assault also occurred at night. CB was waiting in her mother's bedroom for her mother to return home when defendant came into the room and again got into bed with CB. Defendant again started to touch her on her chest, vagina, and bottom until she slapped him on his arm, causing him to bleed and defendant stopped touching her at that point.

-1-

On August 28, 2012, Mary, CB's aunt, visited CB at her grandparents' home. CB told Mary that she was extremely uncomfortable with defendant around. She further explained to Mary that sometimes defendant would rub her back and bottom during movies and that he rubbed her on her back and breasts while she was in bed. CB told Mary that defendant would lie in bed with her when he would come in to say goodnight.

After the victim told Mary about the sexual assaults, Mary disclosed to Sandra what CB had told her. Sandra was of course shocked, upset, and torn by the victim's allegations. While defendant denied to Sandra that he abused CB, defendant moved out of Sandra's home and soon thereafter left for North Carolina without her, despite the couple having plans to vacation there together. On August 29, 2012, Margie Harris, an investigator with Child Protective Services (CPS) began to investigate CB's allegations of sexual abuse. When Harris questioned defendant, he again denied the allegations. However, defendant also denied that he was previously accused of sexual abuse. Harris's investigation revealed that defendant had in fact previously been accused of inappropriately touching his own daughter, MB.

On August 31, 2012, Officer Thomas Sabo with the Norton Shores Police Department met with Sandra and CB. At that time, CB told Officer Sabo that she had lied about the allegations of sexual abuse against defendant. She also told Sandra that she lied.

Nevertheless, CB's allegations formed the basis of the crimes for which the defendant was charged and of which he was ultimately convicted. During a three day jury trial, evidence was presented including CB's testimony that defendant abused her on the two aforementioned occasions. Additionally, the prosecutor introduced the following evidence to support CB's testimony of sexual abuse.

On December 14, 2011, defendant had a 3-1/2 hour visit with his own daughter, MB. After the visit, MB was brought to a hospital where Tara Blandford-Mayberry, a certified Sexual Assault Nurse Examiner (SANE), and Dr. Lucas Leete examined her. When Ms. Blandford-Mayberry asked MB why she was there, she responded by saying that defendant had touched her vagina. MB also said that she had touched defendant on his penis.

Additionally, a third female child, ES, age six, testified that in February and March of 2014, her mother, Mary Lynn, had a boyfriend named "George." ES testified that "George" touched her vaginal area on more than one occasion and Mary Lynn testified that the "George" being referred to by ES was defendant. Mary Lynn said that defendant slept over at least once while she was working at night and ES was home.

Further, hundreds of images of suspected child sexually abusive material were found on defendant's cellular telephone. At trial, specific testimony was introduced regarding twelve photographs recovered from defendant's cellular telephone of prepubescent females engaged in sexual acts.

Barbara Cross was admitted by the trial court as an expert in the area of child sexual abuse and testified that delayed disclosure of abuse by victims is common. Cross testified that a sexual offender will typically select a victim who is least likely to tell others, based on a disability or emotional vulnerability. She testified that roughly one quarter of victims recant

their allegation of abuse at some point and that one reason victims recant is because they see that their mothers are upset. Cross explained that a child's recanting at some point does not mean that the original allegations of abuse are false.

Cross also testified that studies show some sexual offenders "intentionally and purposefully find" a vulnerable or single woman who needs help, for the predatory purpose of molesting the woman's child. Lastly, Cross testified that young girls who do not have a father figure are more vulnerable to sexual exploitation by an offender who befriends the child.

After hearing all of the above evidence, the jurors found defendant guilty of second-degree criminal sexual conduct as a result of the first incident and assault with intent to commit second-degree criminal sexual conduct stemming from the second incident described above. The trial court scored the sentencing guidelines for the CSC at 50 to 150 months, however sentenced defendant to 180 to 360 months. The guidelines for the assault with intent to commit CSC were scored at 19 to 57 months and defendant was sentenced to 36 to 120 months to be served concurrently with the CSC sentence. Defendant appealed.

## II. SENTENCING DEPARTURE ISSUE

On appeal, defendant argues that he is entitled to resentencing because the minimum sentence imposed by the trial court for the second degree CSC conviction violated the principles of proportionality and the trial court's reasoning for the departure was neither substantial nor compelling and thus insufficient to justify the sentence. We disagree.

Under the recent case of *People v Lockridge*, 498 Mich 358; ___ NW2d ___ (2015), a trial court is no longer required to articulate substantial and compelling reasons for a departure from the sentencing guidelines' minimum sentence range. *Id.* at ___; slip op at 29. Moving forward, we note that "sentence[s] that depart from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *Id.*

In *People v Steanhouse*, ___ Mich ___; ___ NW2d ___ (2015) (Docket No. 318329), this Court has stated the test to be used in determining the reasonableness of a sentence upon review. In *Steanhouse*, ___ Mich at ___; slip op at 24, this court concluded that "reinstating the previous standard of review in Michigan, as a means of determining the reasonableness of a sentence, is preferable to adopting the analysis utilized by the federal courts and is most consistent with the Supreme Court's directives in *Lockridge*." Furthermore, "a sentence that fulfills the principle of proportionality under *Milbourn* and its progeny constitutes a reasonable sentence under *Lockridge*." *Id.*

Under the test articulated in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), "the principle of proportionality . . . requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." Stating it another way, "the judge . . . must take into account the nature of the offense and the background of the offender." *Id.* at 651. Regarding sentences that depart from the guidelines' recommendation, the *Steanhouse* court quoted *Milbourn* at length, including:

> that departures from the guidelines are appropriate where the guidelines do not adequately account for important factors legitimately considered at sentencing . . .

[T]rial judges may continue to depart from the guidelines when, in their judgment, the recommended range under the guidelines is disproportionate, in either direction, to the seriousness of the crime. [*Steanhouse*, ___ Mich at ___; slip op at 23 quoting *Milbourn*, 435 Mich at 657].

Here, the trial court, when handing down defendant's sentence, properly took "the nature of the offense and the background of the offender" into consideration. *Milbourn*, 435 Mich at 651. Defendant was a habitual-third offender who was convicted of sexually assaulting a child whom he had convinced to call him "dad" and at the time of sentencing had numerous charges pending against him in three different states—a probation violation in Florida, indecent liberties with a child and five counts of sexual exploitation of a minor in North Carolina, and possession of child sexually abusive material and first degree criminal sexual conduct in a different county within Michigan. As the trial court noted at sentencing, it "can consider other situations even if they have not resulted in convictions in making sentencing decisions." The trial court properly took into account the heinous nature of the offenses committed against CB and the defendant's perpetual pattern of preying on female children wherever he goes. On the record at sentencing, the trial court stated:

> I try to be respectful and professional up here . . . but among the sex offenders I've handled, you rank right up there with the worst in terms of pattern and pervasiveness of the conduct. I seriously considered these numbers and I do think this is the right sentence.

We agree. Therefore, we find that the sentence imposed by the trial court was "proportionate to the seriousness of the circumstances surrounding the offense and the offender" and uphold it.

### III. SCORING ISSUE

On appeal, defendant argues that Offense Variable (OV) 10 was incorrectly scored, and as a result, resentencing is proper. We review a lower court's factual determinations for clear error and such determinations must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). We review de novo the question of whether the facts that were found are enough to support the scores. *Id.* Again, we disagree with defendant. In *Lockridge*, the court specifically stated that when a defendant "received an upward departure sentence that did not rely on the minimum sentence range from the improperly scored guidelines . . . the defendant cannot show prejudice from any error in scoring the OVs in violation of *Alleyne*," *Lockridge*, 498 Mich at ___; slip op at 31, and "as a matter of law, a defendant receiving a sentence that is an upward departure cannot show prejudice and therefore cannot establish plain error." *Id.* at ___; slip op at 32 n 31.

Here, defendant is in the same position as the defendant in *Lockridge*. Whether OV 10 was scored correctly or incorrectly is of no consequence regarding defendant's sentence because the trial court, in its discretion, made an upward departure from the allegedly improperly scored guidelines. However, "a scoring error may still affect a defendant through such things as its effect on the calculation of parole eligibility," therefore we must determine if OV 10 was in fact scored incorrectly. *People v. Melton*, 271 Mich App 590, 593; 722 NW2d 698 (2006).

-4-

OV 10, found at MCL 777.40, allows for points to be scored if the victim is vulnerable and exploited by the defendant. To score 15 points, which the trial court did here, there must be some form of predatory conduct by the defendant. MCL 777.40(1)(a). The statute further defines predatory conduct as "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a).

The trial court found that when defendant first moved into the home and convinced CB to call him dad, he engaged in predatory conduct. It was certainly done before the offense occurred and was directed at CB, the victim. Also, CB did not have her biological father in her life which is a vulnerability that the defendant was able to exploit by manipulating CB into calling him dad. By doing so, defendant gained the trust of CB and was able to use that newly established bond to get closer to her and be able to do things such as tuck her into bed at night, which was when defendant molested her. The new father figure act, appears to have been nothing more than a ploy used by defendant to gain access to the victim for the intended purpose of victimizing her: a quintessential example of predatory conduct. Therefore, the trial court did not clearly err in its factual determinations, and we affirm the trial court's scoring of OV 10.

## IV. CONCLUSION

We find neither of defendant's arguments for resentencing to be compelling. The trial court was well within its discretion to make an upward departure from the minimum sentencing guidelines' range if the sentence imposed passed the principle of proportionality found originally in *Milbourn* and more recently in *Steanhouse*. We find that it did. Secondly, we find that defendant did engage in predatory conduct; therefore, OV 10 was scored properly by the trial court, and we remand for adjustment of the sentencing guidelines score is not warranted. Thus, we affirm the sentence.

Affirmed.

/s/ Jane E. Markey
/s/ Donald S. Owens
/s/ Amy Ronayne Krause